HON. JAMES BARRETT,
HON. ASAHEL PECK,
HON. HOYT H. WHEELER,
HON. HOMER E. ROYCE,        } ASSISTANT JUDGES.
HON. TIMOTHY P. REDFIELD,
HON. JONATHAN ROSS,

---

## A. S. MOORE *v.* LEANDER QUINT.

*Draft. Payment. Evidence. Statute of Limitations. Known Property.*

J. was holding a note against the defendant, he and the defendant both being in California, in favor of his brother, the plaintiff, who resided in Vermont, for the purpose of having the defendant pay it to him as the agent of the plaintiff, and while thus holding it he surrendered it to the defendant on the occasion of the defendant buying and forwarding a draft to the plaintiff to pay the note. There being a dispute between the plaintiff and the defendant as to the manner in which the note was to be paid, and as to whether the draft was a payment, the fact that the note was surrendered by J. as above

13

stated was proper evidence tending to show that what the defendant did on that occasion was done according to the agreement of the parties, and the court should have so instructed the jury.

If the defendant was to pay the note by sending the money instead of a draft, and the defendant on his own motion sent a draft, the relation of the plaintiff to the draft would not subject him to the rules of the law-merchant as to notice and return on its non-acceptance. He would be the agent of the defendant in sending the draft forward for acceptance and payment, and would only be bound to exercise good faith and proper diligence.

The defendant, residing in California, owned for a long time a farm, in this State, which was mortgaged. The note in suit had been overdue for more than six years, and the defendant claimed it was barred by the statute of limitations by reason of his owning said farm; but the court instructed the jury that when real estate is under mortgage, it is not in the sense of the law *known property*, subject to attachment, because the party in order to avail himself of it has to become " embarrassed." *Held* that this proposition does not give the true view of the subject as involved in this case.

Whether in a given case mortgage incumbrances would exclude property · from the expression, " known property which could by the common and ordinary process of law be attached," would depend on whether by attachment and levy the creditor might derive substantial benefit in the matter of getting pay on his debt.

The uncontradicted evidence of the defendant as detailed in the opinion of the court shows a case of *known property ;* and *Wheeler* v. *Brewer*, 20 Vt., 113, referred to and approved.

Assumpsit. Pleas : the general issue, payment, and statute of limitations. Trial by jury, at the June term, Caledonia county, 1870, Steele, J., presiding. Verdict for the plaintiff.

The defendant excepted to the charge of the court in the following particulars :

1. " To the instructions of the court to the effect that if defendant gave plaintiff a note April 12, 1854, it was defendant's duty to seek out the note wherever it might be and pay it, and the sending of the draft, unless accepted by defendant, and made available to payment of the note, would be no payment of the note." 2. " To the charge in regard to the diligence of the plaintiff in returning the draft." 3. " To the charge in regard to the surrender of the note." 4. " To the charge that defendant's property must be unembarrassed by incumbrances in order to be known property available by attachment." 5. " To the charge on the subject of interest."

The plaintiff's evidence tended to prove that on the 12th day of April, 1854, he made a settlement with the defendant in Sonora, California, where they then both resided, for money loaned to him at different times ; that he received a sum of money amounting to about $1800, and that there was still a balance due him of $464, for which he took the defendant's note at twelve per cent. interest,

payable September 1st, 1854 ; that the plaintiff sailed for his home in Vermont on the 15th of said April ; that he left the note with John B. Moore, his brother, in Sonora ; that the defendant was to send him the money in payment of the note at his expense ; that he never received the money, but in 1855 he received a draft from the defendant of $500 ; that the defendant knew he so left the note with his brother, J. B. Moore ; that he expected the defendant would send the money by express ; that he told the defendant, when they were writing the note, that he would leave it with his brother, to be paid to him ; that he did so leave it with his brother ; that in 1855 the defendant and said J. B. Moore went to the express office of Adams & Co., in Sonora, and the defendant bought and paid for a draft of sufficient amount to pay the note and interest, and sent it to the plaintiff in Vermont. This was the substance of all the evidence on the part of the plaintiff that came to the reporter, but other facts are stated in the course of the charge to the jury.

The defendant's evidence tended to show that he is a lawyer, and resided in said Sonora, and there practiced his profession from the spring of 1850 to the spring of 1863 ; that he and the plaintiff were school-boys in Ryegate, Vt., and that he met the plaintiff in California frequently ; that the plaintiff was engaged in mining in California, and left there for Vermont in 1854 ; that he loaned money for the plaintiff while he was in California, at different times, to the amount of about $1200 ; that he never borrowed a dollar of the plaintiff on his own account ; that he never owed the plaintiff anything, but when the plaintiff was about to leave for Vermont, there was between $400 and $500, which the defendant had loaned for him, which was not then due, and he could not then collect, and the plaintiff left it for him or his brother, J. B. Moore, to collect ; that he, the defendant, collected it, and in accordance with his instructions bought a draft of Adams & Co. for $500, paying them in coin or gold dust, which was all that was due the plaintiff, principal and interest, and paid $20 for transporting the money to the plaintiff in Vermont, and either he or J. B. Moore forwarded the same to the plaintiff as he had instructed, the 14th of February, 1855 ; that Adams & Co. was the principal

if not the only express company doing business in said Sonora, and was the only means they had of forwarding money, and was the usual way of forwarding money, and was reputed to be a wealthy house, and perfectly safe ; that in six or eight weeks thereafter this house failed ; that he heard nothing of this draft, which was upon the house of Adams & Co. of Boston, for several years, and supposed it was paid ; that if he had known it was not paid he could have secured a portion of it for the plaintiff; that he purchased his father's farm in February, 1854, after the decease of his father, for about $2000 ; that it is located in said Ryegate, on Wells River, and had a saw-mill and oat-mill on it ; that in October, 1856, he sold and conveyed eight acres of it to one William McLane ; that when he purchased it there were incumbrances on it but all were paid off in 1856, and since there has been no incumbrances thereon ; that he had continued to own the property, except said eight acres, ever since, and it is now worth much more than $2000 ; that his father lived on it at the time of his decease, and the plaintiff's brother and sister had lived on it since ; that they had no means except what he furnished them, and his brother had been an invalid ; that while the plaintiff was in California he and the defendant had frequently talked over matters at home and family affairs, and that he told the plaintiff he was going to purchase this property as soon as he went home, as it was the old homestead of his father and grandfather, and he intended to keep it ; that he came home and purchased it, and after he returned to California he told the plaintiff he had made the purchase.

It further appeared from the bill of exceptions that the plaintiff's evidence tended to prove, on trial, that the note in question called for interest at twelve per cent., and the plaintiff was allowed, against the defendant's exception, to prove that this stipulation as to interest was lawful in California, where the note was given, by reading from a book purporting to be a volume of the statutes of California. This book was the only evidence offered on the subject of the law of California. The verdict under the charge of the court shows how much would be due the plaintiff if the interest was computed at six per cent.

It appeared that the draft which the defendant claimed was a pay-

ment was drawn by Adams & Co. on their branch house in Boston, and that it was made payable in Boston, and as soon as received was sent to Boston and presented for payment, and payment was refused and the draft protested, the same steamer which brought the draft bringing news of their condition which led them to refuse payment of their paper.

The charge of the court was made a part of the bill of exceptions, and was in substance as follows :

The plaintiff claims that on the 12th day of April, 1854, he made a settlement with the defendant for money loaned to him at different times ; that he received a sum of money amounting to about $1300, and that there was still a balance due him of $464, for which the plaintiff says that he took the defendant's note at twelve per cent. interest, payable the September following. If this is the true version of the case, the defendant was bound to pay the note, and he would be bound to find the note, to pay it, wherever it should be held ; and a payment by a draft would not operate to extinguish the note, unless the draft was agreed upon as a means of payment, or was accepted and made available to the plaintiff afterwards.

The defendant claims that this transaction was of a different character, and that whatever he did he did, as the agent or servant of this plaintiff. But if he was a debtor to the plaintiff, having borrowed money of him, as the plaintiff says, and given his note, then he was bound to send the draft at his own risk, unless it was agreed between the plaintiff and the defendant that it was to be paid by sending a draft. Where nothing is said as to the mode of payment, the debtor who forwards such a draft, or sends money by express, or in any other manner, is bound to take the risk of that money until it reaches the hands of the creditor. If, on the other hand, it is agreed that the money is to be sent in a particular way, then, of course, that agreement absolves the debtor from any responsibility, provided he follows the creditor's direction.

The defendant claims, in the first place, that he was not a debtor, but an agent, and exercised good faith in sending that draft. And that would be a sufficient answer. And then he claims, in the next place, that he sent the money as the plaintiff directed and instructed him to send. And that would be a good answer. If either of these propositions is found in favor of the defendant, then the plaintiff cannot recover, but if these propositions are found in favor of the plaintiff — that is, if you find it was a debt to begin with, and that the mode of sending was

not made by the plaintiff, but a mode adopted by the defendant, then it was at his own risk. The plaintiff says that it was distinctly understood that no mode of sending the money was specified by him. There is some evidence that it was understood by the parties that it was to be sent by express. Still, sending a draft is not sending the money by express. A draft is simply an evidence of debt. The plaintiff, unless he had agreed to take the draft, would not be bound to take it, even if it was a good one; still less if it was not good. But if he directed him to send a draft, this would be an answer. So that you have to look in the first place at the nature of the original transaction, whether or not the plaintiff has made out that the defendant stood in the relation of debtor to him, or merely that of servant. If the latter, then the plaintiff cannot recover in this case. If the former, then you are to inquire whether the money was sent in the manner directed and specified by the plaintiff. If it was not sent in the manner directed and specified by the plaintiff, or there was any direction and it was not followed, then the sending of the draft would not be an accounting to the plaintiff unless the plaintiff availed himself of the draft.

The next point made by the defendant is that the plaintiff availed himself of this draft; that after he received the draft he undertook to get the money on it; sent it to Boston, and that it was there protested. After the draft came to him, he was bound, if he did not wish to receive the draft, to exercise good faith towards the defendant. And if he sent it to the place where it was payable, he so far did right. That was part of his duty so to do. If it was then protested and returned, he was bound to send it back to the defendant. It seems that he sent it back to California, to his brother; and his brother testifies that as soon as he received it he informed the defendant, and that he sent it to Vermont, with instructions to the plaintiff that he was coming on the next year and would arrange the matter, settle it satisfactorily in some way, and sent him twenty dollars. The defendant says that he never heard anything about this draft for some years, and supposed it was paid. Now, if the plaintiff, after receiving this draft, did not send it back, but kept it for some years, that would operate as an acceptance of the draft. If, on the contrary, he sent it back in a short time, and it was carried to the knowledge of the defendant, then, although he might not have sent it back by the very next mail, and although it may have laid in the bank a short time, that would not operate as an acceptance, provided the defendant was not prejudiced. If he failed to return it so that it came to the defendant's knowledge that it was unpaid, and he thereby lost the

means of getting it of the express company, then that would operate as an extinguishment of the debt. But if he sent it back soon, within a reasonable time, and the delay did not operate to prejudice the defendant more than it would if he had sent it back directly, then the mere fact that there was some trifling delay, in the bank, of a few weeks, or of a month, would not operate to prejudice the plaintiff in this case.

A good deal has been said as to the effect of the surrender of the note. There is but little importance to be given to the fact that the note was surrendered. The defendant denies that there was any note at all; says that he never gave any note. The plaintiff, on the other hand, says that the note was simply deposited with his brother. The fact that it was surrendered by the brother to the defendant could not prejudice the plaintiff any more than if he had sent it by letter to the defendant, and told him to send the cash. The mere fact that the note was surrendered has very little significance in the case. The question is, if there was a note, whether the note has been paid, not whether the note has been surrendered.

If this mode of payment was a mode chosen by the defendant, and if the draft was not met, and was sent back to the defendant in season for the defendant to avail himself of all the rights that he would have had, so that he has not been prejudiced by the delay, then you come to the next great inquiry in the case: as to whether or not this debt has been barred by the statute of limitation.

The claim which the defendant presents here is a claim of indebtedness which accrued on the 12th of April, 1854, and became due on the September following. More than six years have elapsed since that time, and the debt would be barred by the statute of limitation, confessedly, if the defendant had been a resident of this state. But it is answered that he has not been a resident of the state. That would answer as creating an exception under the statute, and to prevent the statute from running, unless the defendant has had known attachable property in this state. It is conceded that he had a farm in the town of Ryegate, a hundred acres of land, which was substantially available upon attachment. That farm was purchased by him prior to the creation of this debt; but at that time it was under a mortgage for substantially its value. Where real estate is under mortgage, that is not, in the sense of the law, known property, subject to attachment, because the party, in order to avail himself of it, has to become embarrassed. In order to be known property in the sense of the statute, it must be known property free from mortgage. But this mortgage has since that

time been lifted. They have all been paid. On the 9th of March, 1857, the last mortgage was paid. This suit was not commenced until 1865, which is some eight years after the time that the last mortgage was lifted on this property; so that there have been more than six years that the defendant has owned attachable real estate in this state, unembarrassed by mortgage, and that could have been substantially available to pay this debt. So far there is no question. But the statute requires that it shall be not only attachable and unembarrassed, but that it shall be known property. The question then is: What does the statute mean when it says that it shall be known property? In the first place, if it is known to the plaintiff who held the deed, that makes enough, even if nobody else knew about it. The plaintiff says that he never knew, until just at the time that he commenced this suit, that the defendant had any property in this state. The defendant testifies that he informed the plaintiff, after he returned from a visit to Vermont, that he had purchased the old homestead on Wells River, and that he was going to keep it as a relic of his ancestors. This the plaintiff says he never heard. He says that if he did, he has no recollection of it. The mere fact that he may have been told at some time that he owned this property, when he had no debt that he was attempting to secure against it, if it was mere casual information, that knowledge would not necessarily make it known property years afterward when he came to desire to collect a debt. But if he was told that he had property at that time, even if it was embarrassed, that would be evidence that would tend to show that he had knowledge. The plaintiff, however, says that he had no suspicion that the defendant had property in Vermont. You are to say, under all the circumstances, as to whether or not the plaintiff knew of this property, and of its ownership being in the defendant. If he knew that the defendant had property unembarrassed in this state, and he neglected to prosecute his claim for the period of six years after such knowledge, then the statute has run upon it, and the claim is barred. Then again, if the plaintiff had no knowledge with relation to it, yet if the ownership was of such notoriety that the creditor, by the use of ordinary and reasonable diligence, could have found it out, then it is barred. While actual knowledge by the plaintiff alone would be sufficient to make it known property, in the sense of the statute, it might be known property in the sense of the statute without any knowledge by him, provided it was known by others, and the knowledge of it was so common that it was of such notoriety that the plaintiff, by the exercise of reasonable diligence and ordinary means, would have found it to secure his debt. Upon this question, you

have to consider the situation of this property and the situation of the creditor in respect to it. The defendant lived in the same town, but he lived upon the Connecticut river, upon one side of the town, and this property was upon Wells river, upon another side of the town ; and a great deal is shown by the topography of the town as to whether they had much commerce with each other in these two sections of this town of Ryegate. The defendant did not live upon this place just prior to his going to California. Before his going to California, the plaintiff was aware that for some little time he had been living in Newbury, and had been studying law there with judge Underwood. This place was a place that belonged to the defendant's father. Now, if there had been a change in the occupation of that farm, after the time that the defendant purchased, that would have tended to create more notoriety as to the occupancy than if the occupancy had continued right along as it had done. It seems that the sister and brother continued to live there after the purchase by the defendant, just as they did before. At the same time you are to consider that this was known as the " Quint Place," and say how far that, under the circumstance of being occupied by Eliza Quint and the brother, should have put the plaintiff upon inquiry, and afforded him means to find out, provided he had used proper diligence in collecting his debt. Then you are to consider how generally this purchase was known ; what the understanding and knowledge of others was. There is no rule of law as to how many should know it in order to constitute notoriety. That is not a question of law. It is simply a question of fact as to whether or not the notoriety of the fact is sufficient. Of course the more the notoriety the greater the likelihood that the defendant would have found out, if he had made an effort to look up the property. The fact that the deed to the defendant was recorded is an item of testimony to be considered. But that is by no means conclusive. It does not follow that because a deed is put upon record he is to know to what party it belongs, because it is not to be presumed that every man consults the records, that is, not in relation to such a question as this. If a man purchases property he is charged with every thing that is upon the record, or charged with every thing that appears upon the record, and that he could have found, because his attention is directed to that particular piece of property. But the mere fact that there is a record of title in some one does not make the property known property in the sense of the law. Yet if there is recorded property, that is one circumstance to be considered. So if there had been no record, the fact that there was no record would not have been enough to prevent knowledge

of ownership. Here there was one. On this subject you are to consider all the circumstances with relation to this property, the nature of the prior occupation, the early occupation of it before the defendant purchased, the occupation since, the location of it, how much knowledge there was in relation to it, the plaintiff's situation in relation to that property, his means of ascertaining its existence if he had made an attempt to collect the debt; and upon the whole evidence you are to say whether or not the ownership of that property in the defendant was of such notoriety that the plaintiff, by the exercise of diligence and ordinary care, would have been able to find it to secure his debt; by the exercise of such care as a prudent creditor would bring into exercise for the purpose of collecting a debt. Then there is no question but that this property has been unembarrassed for a period of more than six years previous to the attempt to collect this debt and it is barred.

Upon the question as to whether this was originally a debt, the burden of proof is upon the plaintif, to prove it by a reasonable preponderance of evidence. Upon the question as to the plaintiff being barred by the statute of limitation, the burden of proof is upon the defendant.

If the plaintiff recover, he is entitled to recover $464, with interest at the rate of twelve per cent., if you find such was the agreement between the parties.

*Ross & Underwood*, for the defendant, cited to the first exception, Story on Notes, pp. 121, 243, 289, 535; *Bagley* v. *Houghton*, 15 Vt., 626; *Warden* v. *Nourse et al.*, 36 Vt., 756; *Foster et al.* v. *Julian*, Am. Law Reg. N. S. 362; *Griswold* v. *Davis*, 31 Vt., 395.

To the second exception, which relates to the diligence of the plaintiff in returning the draft, Ed. on Bills of Ex., p. 445–6; *Dalton* v. *Trull*, 23 Wend., 345; *Stowe* v. *Kir*, 31 Miss. E, Dalton, 199; *Miller* v. *Rowe*, 1 Burr 452; Sto. on Notes, pp. 250, 517, 697, 700; *Sands* v. *Clark*, 65 E. C. L., 751; *Cambridge* v. *Allenly*, 13 E. C. L., 175; *Rogers* v. *Sanford*, 1 Crom. & Moore, 637; *Howe* v. *Burns*, 5 Taunt., 30; *Peckett* v. *Pearsons*, 17 Vt., 470.

To the 4th exception, relating to the statute of limitations, Gen. Sts., 443, § 15; *Hill* v. *Bellows*, 15 Vt., 727; *Russ* v. *Fay*, 29 Vt., 381; *Wheeler* v. *Brewer*, 20 Vt., 113.

*Belden & May*, for the plaintiff.

" Unless injury of some character result " from incorrect instructions; then there is no good ground to reverse a judgment. *Campbell* v. *Day*, 16 Vt., 558 ; *Bracket et ux.* v. *Moulton*, 6 Vt., 411 ; *Fletcher* v. *Cole*, 26 Vt., 170 ; *Smith et al.* v. *Rockingham*, 25 Vt., 645. " When a person contracts generally to pay a sum of money he is liable to the creditor *everywhere*." *Sanderson* v. *Barnes*, 14 East, 507 ; *Taylor* v. *Snyder*, 3 Denio, 145. Unless a particular way was agreed upon then nothing short of *cash* will discharge indebtedness. *Simons* v. *Clark*, 11 Ill., 137 ; 2 Parsons on Con., p. 620 *et seq.* The draft of the Adams Express Company stands no better than a note of an individual, or the bills of an insolvent bank, or a cashier's check, or a counterfeit bill. In such cases payment with them is deemed *no payment. Markle* v. *Hatfield*, 2 John., 455 ; Ed. Bills of Ex., 190 ; *Gilman* v. *Peck*, 11 Vt., 516 ; *Vide* 9 N. H., 365 : 11 Wend., 9 : 5 Taunton R., 488 : 6 B & Cr., 373. The following cases decide that if the party receiving a worthless check, etc., is guilty of no negligence and seasonably offers to return the same, he may resort to the original contract. *Gilman* v. *Peck*, 11 Vt., 516 ; *U. S. Bank* v. *Georgia*, 10 Whea., 333 ; *Young* v. *Adams*, 6 Mass., 152 ; *Bank* v. *Lightbody*, 13 Wend., 101 ; *Vide* 6 Hill, 340 ; 22 Me., 88 ; 19 Wend., 557. The question whether the delay was unreasonable was one of fact. Starkie's Ev. § 773. This draft amounted to a mere *note* of the Express Company. *McGee* v. *Camack*, 13 Ill., 289 ; *Shipman* v. *Cook*, 1 Green., (N. J.,) 251. The remark about the surrender of the note offers no good reason to reverse the judgment, unless that remark had some important bearing in making the verdict. It was left for the jury to say how the " *whole transaction really was.*" *Vide Royce* v. *Hunt*, 24 Vt., 620 ; *Russ, Admr.*, v. *Fay*, 29 Vt., 381 ; *Wheeler* v. *Brown*, 20 Vt., 113. The Statute Book of California was admissible. 1 Green's Ev. §§ 489–91 ; *Smith* v. *Potter*, 27 Vt., 304 ; 1 Daniel Chipman, p. 303 ; 8 Foster's Report, p. 473.

The opinion of the court was delivered by

BARRETT, J. I. The defendant asserts that he paid the claim of the plaintiff, whether resting in a note or otherwise, in the

manner that was agreed between them, when the plaintiff was about to leave Sonora in April, 1854, viz. : by buying a draft and forwarding it by express to the plaintiff, on the occasion when John B. Moore surrendered the note to the defendant, as testified by said John B. The plaintiff testified that he left the note with his brother for the purpose of having it paid to him, and that " he left it until it was paid." He claimed on the trial, and testified, that defendant was to pay it, by *sendiny the money* to him. The controversy in this respect was, as to what was the agreement or understanding between the parties, as to the manner in which the payment was to be made. It appears from the testimony in behalf of the plaintiff, that John B. was cognizant of what had passed between the plaintiff and defendant, about the leaving of the claim, the purpose, and how to be paid, and was the agent of the plaintiff in that behalf.

It seems to us that the court, in the charge to the jury, failed in an important respect to give operation to the fact of the surrender of the note by John B. to the defendant. It was treated as if it could legitimately bear only on the rights of the plaintiff, as affected by the legal effect of the fact of surrender by the agent of the plaintiff, upon the assumed hypothesis that the note had not been paid. But having reference to the other evidence in the case, tending to show what was the agreement and understanding between the parties, in respect to the manner in which the defendant was to make the payment to the plaintiff, the fact that John B. was holding the note for the purpose of having the defendant pay it to him, as the agent of the plaintiff, and while thus holding it he surrendered it to the defendant, on the occasion of the buying and forwarding of the draft, was very proper and significant, as matter of *evidence*, on that question, and tending to show that what the defendant did on that occasion, was done according to the agreement and understanding of the parties, as to the manner in which the payment was to be made. In this view, the charge deprived the defendant of that fact as *evidence* upon the decisive question in dispute, by assigning it a nugatory office, when permitted to operate only under the assumption, that the plaintiff's side of that question was true. And the detriment

to the defendant, likely to result from that mode of treating the surrender, would seem not to have been diminished, when the judge, after having told the jury that but little importance was to be given to the fact that the note was surrendered, proceeded, under an obvious misrecollection of the defendant's deposition, and of the plaintiff's testimony above quoted, to say that, " the defendant says there was no note ; denies that there was any note at all ; says that he never gave any note. The plaintiff, on the other hand, says the note was simply deposited with his brother."

The judge was quite right in the closing clause of that paragraph, in saying, " the question is, if there was a note, whether the note has been paid, not whether it has been surrendered." The error consisted in his treating said surrender as not having the character of evidence on that question.

II. If it be true that the defendant was to pay the note, by sending *the money* to the plaintiff, instead of sending a draft, and that the defendant, of his own motion, sent the draft, as a mode chosen by himself of sending the money, we think the relation of the plaintiff to the draft would not subject him to the rules of the law-merchant, as to notice and return on its non-acceptance. In such case, the plaintiff would be the agent of the defendant in sending the draft forward, as he did, for acceptance and payment, and would only be bound to exercise good faith and proper diligence, and would not incur liability, unless the defendant suffered damage, by reason of his improper acts or omissions.

III. The jury were instructed that, " where real estate is under mortgage, that is not, in the sense of the law, *known property*, subject to attachment ; because the party, in order to avail himself of it, has to become embarrassed." We think that this proposition does not give the true view of the subject, as involved in this case. The equity of redemption of property under mortgage, is subject to attachment and levy in security and satisfaction of debts. If the value of such equity should be trifling, as compared with the amount of the mortgage, it might not, under circumstances, be reasonably available by means of levy. If the mortgage should bear but a small proportion to the value of the property, such mortgage could not be regarded as embarrassing a

creditor, who would be entitled to levy on it, for getting satisfaction of his debt. Whether in a given case, mortgage incumbrances would exclude property from the expression, " known property, which could, by the common and ordinary process of law, be attached," would depend on whether, by attachment and levy, the creditor might derive substantial benefit in the matter of getting pay on his debt. This is the sense of all that has been held in the cases in this State. The idea in the word, " *unembarrassed*," as used by the judges, is not that the property may not be at all incumbered by mortgage. It imports rather property of which the debtor's title is not invalid, or seriously questionable, or is not so subject to equitable claims, or is not so incumbered by mortgage, as to render the attachment and levy on it fruitless of substantial benefit to the creditor.

IV.   Again, in respect to its being " known property," it seems to us that the charge was not such as the state of the evidence called for. The defendant testified, that he visited his home in Ryegate, in the fall of 1853, and returned to California in February, 1854 ; that before that visit, he told the plaintiff, that he proposed to purchase the old homestead, and after his return told him he had purchased it. The plaintiff testified that the note was dated April, 1854, and that he left Sonora for his home in Vermont the 15th of April, 1854, and that the note fell due, September 1st, 1854 — six or seven months after the defendant, according to his testimony, informed the plaintiff of his purchase of the property in Ryegate. In reference to this, the jury were told that, " the mere fact that the plaintiff may have been told at some time that the defendant owned the property, when he had no debt that he was attempting to secure against it, if it was mere casual information, that knowledge would not necessarily make it known property years afterwards, when he came to desire to collect a debt."

That instruction was not only not adapted to the state of the evidence, but was directly calculated to give the jury a wrong impression, as to what the evidence really was, that bore on the subject. The time when " he might desire to collect a debt," should not have been confounded with the time when the debt became due. It was not " years afterwards " that the plaintiff's

debt became due and collectable, but only some six or seven months ; at which time the statute began to run, if the defendant then had *known property* within the State. So the court, instead of saying " *years* afterwards," should have said six or seven months afterwards ; and should have called the attention of the jury to the time when the note fell due, and instructed them to consider the evidence bearing on the question of the ownership of the property being known to the plaintiff, with reference to that time.

If it should be said that, when the defendant bought the property in 1854, it was incumbered to such an extent as not to have been available by attachment, it is to be kept in mind that such incumbrance was in the process of being removed immediately after the purchase, and was entirely removed in March, 1857. So that, if the plaintiff was informed of the purchase, as the defendant testified, he could hardly avoid the legal effect of the defendant's ownership of it as known property, in the relation he sustained to the subject, by saying or proving that he had forgotten it before he could make it available on his debt by attachment. Then again, it would seem that the court, in this connection, had not fully in mind the testimony given by the defendant, in characterizing as " casual information " that " while in California we frequently talked over matters at home, and family affairs, and I told plaintiff that I was going to purchase this property as soon as I went home, as it was the old homestead of my father and grandfather, and I intended to keep it. · And afterwards, on my return to California, we were talking over matters and things at home, and I told him I had made a purchase of this property." The plaintiff testified that he never heard this, " or if he did, he had no recollection of it at all." Such an answer to what the defendant had thus testified would hardly warrant the court in characterizing that testimony of the defendant as " *casual* information." The defendant was entitled to have it put to the jury in the sense and effect of what he testified, it being for the jury to find whether it was true or not. There was no alternative between that and some other version of what the defendant told the plaintiff, for the plaintiff ignores that the defendant said anything

to him on the subject. If in fact the defendant told the plaintiff as he testifies he did, besides its legal effect of making it known property, it would, as matter of evidence, bear strongly on the question of reasonable diligence which was made to the jury.

V.   But again, it seems to us that the uncontradicted evidence on the part of the defendant showed a case of *known property*, within the meaning of the statute.   It appears that the defendant became the owner of that property in February, 1854, soon after the death of his father ; that his title was duly matter of record, and that his ownership was as open and notorious as it could be without his actual personal occupation.   There is nothing in the evidence tending to show any facts calculated to obscure his title, or to mislead any one in respect to it, or to impede the plaintiff in knowing the true ownership of the property, — as there was in the case of *Wheeler* v. *Brewer*, 20 Vt., 113, — the law of which case we fully indorse and adopt.

Upon such a state of facts, it would seem to be trifling with the sense and purpose of the statute to permit a jury to say, by a verdict, that it was not known property.   To do so would be virtually resolving the matter into the question, whether the plaintiff *in fact* knew of such ownership, with the burden on the defendant of proving *such* knowledge : — for, upon the evidence as it is before us in the defendant's deposition, and in the statements and intimations in the charge, if a jury would say that the plaintiff, on reasonable search and inquiry, would not have found out that the defendant owned the property, it is difficult to conceive a case in which they might not with equal propriety do the same.

In this connection we think it not without interest to allude to some features of fact, about which no controversy is indicated by the bill of exceptions, viz : that previous to the purchase by the defendant, in 1854, the property had been owned by his father and grandfather as the family homestead, and that the father was so owning it at the time of his death ; that he left it incumbered to near its value, and was without means of relieving it ; that he left on it an invalid son and a daughter as his surviving family, without property, who thenceforward continued to live on it ; that on said premises were a grist-mill and an oat-mill ; that in 1856

the defendant sold and conveyed a portion of said farm ; that the plaintiff and defendant had been school-boys together in said Ryegate, and were intimate in California, where the plaintiff employed and trusted the defendant as a man of business capacity and activity, of means and responsibility ; that under these circumstances the plaintiff, in April, 1854, returned and resumed his residence in Ryegate, where said property is situated, and continued to reside there thenceforward.

VI. Without announcing a decision of the question as to the authentication of the statute of California, it will be sufficient to intimate that it will be discreet in the plaintiff not to hazard any right he may claim, by relying on such proof of the statute laws of that State.

The judgment is reversed, and cause remanded.